**Fill in this information to identify the case:**

Debtor 1  Paul James Mercier

Debtor 2 _____
(Spouse, If filing)

United States Bankruptcy Court for the _____ District of New Hampshire
(State)

Case number:  18-10497-BAH

Official Form 427
Cover Sheet for Reaffirmation Agreement                                                                12/15

Anyone who is a party to a reaffirmation agreement may fill out and file this form. Fill it out completely, attach it to the reaffirmation agreement, and file the documents within the time set under Bankruptcy Rule 4008.

| Part 1 | Explain the Repayment Terms of the Reaffirmation Agreement |
|---|---|

**1. Who is the Creditor?**

Quicken Loans Inc.
Name of the creditor

**2. How much is the debt?**

On the Date that the bankruptcy case filed     $71,032.36

To be paid under the reaffirmation agreement     $71,063.26

$444.44 per month for 315 months (if fixed interest rate)

**3. What is the Annual Percentage Rate(APR) of Interest? (See Bankruptcy Code §524(k)(3)(E).)**

Before the bankruptcy case was filed 3.99%

Under the Reaffirmation Agreement 3.99%

☒ Fixed Rate
☐ Adjustable rate

**4. Does collateral secure the debt?**

☐ No
☒ Yes. Describe the Collateral 81 East Bow Street, Franklin, NH 03235

Current Market Value: $138,523.00

**5. Does the creditor assert that the debt is nondischargeable?**

☒ No
☐ Yes. Attach an explanation of the nature of the debt and the basis for contending that the debt is nondischargeable.

**6. Using information from Schedule I: Your Income (Official Form 106I) and Schedule J: Your Expenses (Official Form 106J), fill in the amounts**

Income and expenses reported on Schedules I and J

6a  Combined monthly income from Line 12 of Schedule I     $ 3486.77

6b. Monthly expenses from line 22c of Schedule J     $ 4712.45

6c. Monthly payments on all reaffirmed debts not listed on Schedule J     $ 0

6d. Scheduled net monthly income     $ (1230.60)

Subtract lines 6b and 6c from 6a.

If the total is less than 0, put the number in brackets

Income and Expenses stated on the reaffirmation agreement

6e. Monthly income from all sources after payroll deductions     $ 3486.77

6f. Monthly expense     $ 4712.45

6g. Monthly expenses on all reaffirmed debts not included in monthly expenses     $ 0

6h. Present net monthly income     $ (1236.60)

Subtract lines 6f and 6g from 6e.

If the total is less than 0, put the number in brackets

| Debtor 1 | Paul James Mercier | | | Case number: | 18-10497-BAH |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |

**7.** Are the income amounts on lines 6a and 6c different?

☒ No
☐ Yes. Explain why they are different and complete line 10. _____

**8.** Are the expenses Amounts on lines 6b And 6f different?

☒ No
☐ Yes. Explain why they are different and complete line 10. _____

**9.** Is the net monthly income in line 6h less than 0?

☐ No
☒ Yes. A presumption of hardship arises (unless the creditor is a credit union).
Explain how the debtor will make monthly payments on the reaffirmed debt and pay other living expenses.
Complete line 10.

*Debter will reduce expenses to make payment*

**10.** Debtor's certification about lines 7-9

If any answer on lines 7-9 is Yes, the debtor must sign here.

If all the answers on lines 7-9 are No, go to line 11.

I certify that each explanation on lines 7-9 is true and correct.

x _____
Signature of Debtor 1

x _____
Signature of Debtor 2 (Spouse Only in Joint Case)

**11.** Did an attorney represent the debtor in negotiating the reaffirmation agreement?

☐ No
☒ Yes. Has the attorney executed a declaration or an affidavit to support the reaffirmation agreement?
☐ No
☒ Yes.

| Debtor 1: | Paul James Mercier | | | Case number: | 18-10497-BAH |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |

| Part 2 | Sign Here |
|---|---|

| Whoever fills out this form must sign here, | I certify that the attached agreement is a true and correct copy of the reaffirmation agreement between the parties identified on this *Cover Sheet for Reaffirmation Agreement.* |
|---|---|

X _____  Date: 6/7/2018
   Signature                            MM / DD / YYYY

Print: Marcus Pratt ( NH Bar # 21206 )
       Printed Name    ( BNH # 07275 )

Check one:
☐ Debtor or Debtor's Attorney
☒ Creditor or Creditor's Attorney

Form 2400 A (12/15)

```
Check one.
☑  Presumption of Undue Hardship
☐  No Presumption of Undue Hardship
See Debtor's Statement in Support of Reaffirmation,
Part II below, to determine which box to check.
```

UNITED STATES BANKRUPTCY COURT
For The District of New Hampshire

In re: <u>Paul James Mercier,</u>          Case No. <u>18-10497-BAH</u>
           *Debtor*

                                          Chapter <u>7</u>

### REAFFIRMATION DOCUMENTS

Name of Creditor: <u>Quicken Loans Inc.</u>

☐  Check this box if Creditor is a Credit Union

### PART I. REAFFIRMATION AGREEMENT

**Reaffirming a debt is a serious financial decision. Before entering into this Reaffirmation Agreement,
you must review the important disclosures, instructions, and definitions found in Part V of this form.**

A. Brief description of the original agreement being reaffirmed: <u>Note dated May 3, 2014 for property located at</u>
<u>81 East Bow St., Franklin, NH 03235, secured by a mortgage recorded on May 8, 2014 at the Merrimack</u>
<u>County Registry of Deeds.</u>

                                                        *For example, auto loan*

B. *AMOUNT REAFFIRMED:*    $71,063.26

      The Amount Reaffirmed is the entire amount that you are agreeing to pay. This may include unpaid
      principal, interest, and fees and costs (if any) arising on or before <u>April 17, 2018,</u>
      which is the date of the Disclosure Statement portion of this form (Part V).

      *See the definition of "Amount Reaffirmed" in Part V, Section C below.*

C. The *ANNUAL PERCENTAGE RATE* applicable to the Amount Reaffirmed is <u>3.99%</u>.

      *See definition of "Annual Percentage Rate" in Part V, Section C below.*

      This is a *(check one)*   ☒ Fixed rate           ☐ Variable rate

If the loan has a variable rate, the future interest rate may increase or decrease from the Annual Percentage
Rate disclosed here.

Form 2400 A, Reaffirmation Documents                                                Page 2

D.  Reaffirmation Agreement Repayment Terms *(check and complete one)*:

☒   $444.44 per month for 315 months starting on April 1, 2018.

☐   Describe repayment terms, including whether future payment amounts(s) may be different from
the initial payment amount.

E.  Describe the collateral, if any, securing the debt:

Description:                          81 East Bow Street, Franklin, NH 03235
Current Market Value                  $138,523.00

F.  Did the debt that is being reaffirmed arise from the purchase of the collateral described above?

☐  Yes.  What was the purchase price for the collateral?       $_____

☒  No.   What was the amount of the original loan?             $76,275.00

G.  Specify the changes made by this Reaffirmation Agreement to the most recent credit terms on the reaffirmed
debt and any related agreement:

| | Terms as of the Date of Bankruptcy | Terms After Reaffirmation |
|---|---|---|
| Balance due *(including fees and costs)* | $71,032.36 | $71,063.26 |
| Annual Percentage Rate | 3.99% | 3.99% |
| Monthly Payment | $444.44 | $444.44 |

H.  ☐  Check this box if the creditor is agreeing to provide you with additional future credit in connection with
the Reaffirmation Agreement.  Describe the credit limit, the annual Percentage Rate that applies to future credit
and any other terms on future purchases and advances using such credit:

## PART II.  DEBTOR'S STATEMENT IN SUPPORT OF REAFFIRMATION AGREEMENT

A.  Were you represented by an attorney during the course of negotiating this agreement?

Check one.       ☑ Yes ☐ No

B.  Is the creditor a credit union?

Check one.       ☐ Yes ☑ No

C.  If your answer to EITHER question A. or B. above is "No," complete 1. and 2. below.

1.    Your present monthly income and expenses are:

a.   Monthly income from all sources after payroll deductions

Form 2400 A, Reaffirmation Documents

Page 3

(take-home pay plus any other income)    $ 3486.77

b.  Monthly expenses (including all reaffirmed debts except
this one)    $ 4237.45

c.  Amount available to pay this reaffirmed debt (subtract b. from a.)  $ 0

d.  Amount of monthly payment required for this reaffirmed debt    $ 444.44

*If the monthly payment on this reaffirmed debt (line d.) is greater than the amount you have available
to pay this reaffirmed debt (line c.), you must check the box at the top of page one that says
"Presumption of Undue Hardship." Otherwise, you must check the box at the top of page one that
says "No Presumption of Undue Hardship."*

2.    You believe this reaffirmation agreement will not impose an undue hardship on you or your
dependents because:

Check one of the two statements below, if applicable:

☐    You can afford to make the payments on the reaffirmed debt because your monthly income
is greater than your monthly expenses even after you include in your expenses the monthly
payments on all debts you are reaffirming, including this one.

☑    You can afford to make the payments on the reaffirmed debt even though your monthly
income is less than your monthly expenses after you include in your expenses the monthly
payments on all debts you are reaffirming, including this one, because:

Debtor will reduce other expense
to make payment

Use an additional page if needed for a full explanation.

D.  If your answers to BOTH questions A. and B. above were "Yes," check the following statement,
if applicable:

☑    You believe this Reaffirmation Agreement is in your financial interest and you can afford to
make the payments on the reaffirmed debt.

*Also, check the box at the top of page one that says "No Presumption of Undue Hardship."*

Form 2400 A, Reaffirmation Documents

Page 4

## PART III.  CERTIFICATION BY DEBTOR(S) AND SIGNATURES OF PARTIES

I hereby certify that:

(1) I agree to reaffirm the debt described above.

(2) Before signing this Reaffirmation Agreement, I read the terms disclosed in this Reaffirmation Agreement (Part I) and the Disclosure Statement, Instructions and Definitions included in Part V below;

(3) The Debtor's Statement in Support of Reaffirmation Agreement (Part II above) is true and complete;

(4) I am entering into this agreement voluntarily and fully informed of my rights and responsibilities; and

(5) I have received a copy of this completed and signed Reaffirmation Documents form.

SIGNATURE(S) (If this is a joint Reaffirmation Agreement, both debtors must sign):

Date _____5-21/8_____   Signature _____
_____ *Debtor*

Date _____   Signature _____
_____ *Joint Debtor, if any*

Reaffirmation Agreement Terms Accepted by Creditor:

Creditor __Quicken Loans Inc.__          __635 Woodward Ave., Detroit, MI 48226__
*Print Name*                                            *Address*

Cherria Martin

__Loss Mitigation Officer__          _____   __6/14/18__
*Print Name of Representative*          *Signature*          *Date*

## PART IV.  CERTIFICATION BY DEBTOR'S ATTORNEY (IF ANY)

*To be filed only if the attorney represented the debtor during the course of negotiating this agreement.*

I hereby certify that: (1) this agreement represents a fully informed and voluntary agreement by the debtor; (2) this agreement does not impose an undue hardship on the debtor or any dependent of the debtor; and (3) I have fully advised the debtor of the legal effect and consequences of this agreement and any default under this agreement.

☐ A presumption of undue hardship has been established with respect to this agreement. In my opinion, however, the debtor is able to make the required payment.

*Check box, if the presumption of undue hardship box is checked on page 1 and the creditor is not a Credit Union.*

Date __5/23/2018__   Signature of Debtor's Attorney _____
          Print Name of Debtor's Attorney _____

Form 2400 A, Reaffirmation Documents                                        Page 5

## PART V. DISCLOSURE STATEMENT AND INSTRUCTIONS TO DEBTOR(S)

Before agreeing to reaffirm a debt, review the terms disclosed in the Reaffirmation Agreement
(Part I above) and these additional important disclosures and instructions.

Reaffirming a debt is a serious financial decision. The law requires you to take certain steps to make sure the
decision is in your best interest. If these steps, which are detailed in the Instructions provided in Part V, Section
B below, are not completed, the reaffirmation agreement is not effective, even though you have signed it.

### A. DISCLOSURE STATEMENT

1.  **What are your obligations if you reaffirm a debt?** A reaffirmed debt remains your personal legal
    obligation to pay. Your reaffirmed debt is not discharged in your bankruptcy case. That means that if you
    default on your reaffirmed debt after your bankruptcy case is over, your creditor may be able to take your
    property or your wages. Your obligations will be determined by the reaffirmation agreement, which may
    have changed the terms of the original agreement. If you are reaffirming an open end credit agreement,
    that agreement or applicable law may permit the creditor to change the terms of that agreement in the
    future under certain conditions.

2.  **Are you required to enter into a reaffirmation agreement by any law?** No, you are not required to
    reaffirm a debt by any law. Only agree to reaffirm a debt if it is in your best interest. Be sure you can
    afford the payments that you agree to make.

3.  **What if your creditor has a security interest or lien?** Your bankruptcy discharge does not eliminate
    any lien on your property. A "lien" is often referred to as a security interest, deed of trust, mortgage, or
    security deed. The property subject to a lien is often referred to as collateral. Even if you do not reaffirm
    and your personal liability on the debt is discharged, your creditor may still have a right under the lien to
    take the collateral if you do not pay or default on the debt. If the collateral is personal property that is
    exempt or that the trustee has abandoned, you may be able to redeem the item rather than reaffirm the
    debt. To redeem, you make a single payment to the creditor equal to the current value of the collateral,
    as the parties agree or the court determines.

4.  **How soon do you need to enter into and file a reaffirmation agreement?** If you decide to enter into
    a reaffirmation agreement, you must do so before you receive your discharge. After you have entered
    into a reaffirmation agreement and all parts of this Reaffirmation Documents packet requiring signature
    have been signed, either you or the creditor should file it as soon as possible. The signed agreement
    must be filed with the court no later than 60 days after the first date set for the meeting of creditors, so
    that the court will have time to schedule a hearing to approve the agreement if approval is required.
    However, the court may extend the time for filing, even after the 60-day period has ended.

5.  **Can you cancel the agreement?** You may rescind (cancel) your reaffirmation agreement at any time
    before the bankruptcy court enters your discharge, or during the 60-day period that begins on the date
    your reaffirmation agreement is filed with the court, whichever occurs later. To rescind (cancel) your
    reaffirmation agreement, you must notify the creditor that your reaffirmation agreement is rescinded
    (or canceled). Remember that you can rescind the agreement, even if the court approves it, as long as
    you rescind within the time allowed.

Form 2400 A, Reaffirmation Documents                                                                     Page 6

6. **When will this reaffirmation agreement be effective?**

   a. **If you were represented by an attorney during the negotiation of your reaffirmation agreement and**

   i. **if the creditor is not a Credit Union,** your reaffirmation agreement becomes effective when it is filed with the court unless the reaffirmation is presumed to be an undue hardship. If the Reaffirmation Agreement is presumed to be an undue hardship, the court must review it and may set a hearing to determine whether you have rebutted the presumption of undue hardship.

   ii. **if the creditor is a Credit Union,** your reaffirmation agreement becomes effective when it is filed with the court.

   b. **If you were not represented** by an attorney during the negotiation of your reaffirmation agreement, the reaffirmation agreement will not be effective unless the court approves it. To have the court approve your agreement, you must file a motion. See Instruction 5, below. The court will notify you and the creditor of the hearing on your reaffirmation agreement. You must attend this hearing, at which time the judge will review your reaffirmation agreement. If the judge decides that the reaffirmation agreement is in your best interest, the agreement will be approved and will become effective. However, if your reaffirmation agreement is for a consumer debt secured by a mortgage, deed of trust, security deed, or other lien on your real property, like your home, you do not need to file a motion or get court approval of your reaffirmation agreement.

7. **What if you have questions about what a creditor can do?** If you have questions about reaffirming a debt or what the law requires, consult with the attorney who helped you negotiate this agreement. If you do not have an attorney helping you, you may ask the judge to explain the effect of this agreement to you at the hearing to approve the reaffirmation agreement. When this disclosure refers to what a creditor "may" do, it is not giving any creditor permission to do anything. The word "may" is used to tell you what might occur if the law permits the creditor to take the action.

## B. INSTRUCTIONS

1. Review these Disclosures and carefully consider the decision to reaffirm. If you want to reaffirm, review and complete the information contained in the Reaffirmation Agreement (Part I above). If your case is a joint case, both spouses must sign the agreement if both are reaffirming the debt.

2. Complete the Debtor's Statement in Support of Reaffirmation Agreement (Part II above). Be sure that you can afford to make the payments that you are agreeing to make and that you have received a copy of the Disclosure Statement and a completed and signed Reaffirmation Agreement.

3. If you were represented by an attorney during the negotiation of your Reaffirmation Agreement, your attorney must sign and date the Certification By Debtor's Attorney section (Part IV above).

4. You or your creditor must file with the court the original of this Reaffirmation Documents packet and a completed Reaffirmation Agreement Cover Sheet (Official Bankruptcy Form 427).

5. *If you are not represented by an attorney, you must also complete and file with the court a separate document entitled "Motion for Court Approval of Reaffirmation Agreement unless your reaffirmation agreement is for a consumer debt secured by a lien on your real property, such as your home. You can use Form B2400B to do this.*

Form 2400 A, Reaffirmation Documents                                   Page 7

## C. DEFINITIONS

1. **"Amount Reaffirmed"** means the total amount of debt that you are agreeing to pay (reaffirm) by entering into this agreement. The total amount of debt includes any unpaid fees and costs that you are agreeing to pay that arose on or before the date of disclosure, which is the date specified in the Reaffirmation Agreement (Part I, Section B above). Your credit agreement may obligate you to pay additional amounts that arise after the date of this disclosure. You should consult your credit agreement to determine whether you are obligated to pay additional amounts that may arise after the date of this disclosure.

2. **"Annual Percentage Rate"** means the interest rate on a loan expressed under the rules required by federal law. The annual percentage rate (as opposed to the "stated interest rate") tells you the full cost of your credit including many of the creditor's fees and charges. You will find the annual percentage rate for your original agreement on the disclosure statement that was given to you when the loan papers were signed or on the monthly statements sent to you for an open end credit account such as a credit card.

3. **"Credit Union"** means a financial institution as defined in 12 U.S.C. § 461(b)(1)(A)(iv). It is owned and controlled by and provides financial services to its members and typically uses words like "Credit Union" or initials like "C.U." or "F.C.U." in its name.

MERRIMACK COUNTY RECORDS *Kathi L. Guay*, CPO, Register

**Return To:**
Document Management
Quicken Loans Inc.
1050 Woodward Ave
Detroit, MI 48226-1906

**Prepared By:**
Maia Goode
1050 Woodward Ave
Detroit, MI 48226-1906
(313)373-0000

──────[Space Above This Line For Recording Data]──────

# MORTGAGE
MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    May 3, 2014      ,
together with all Riders to this document.
**(B) "Borrower"** is Paul J. Mercier and Monique R. Mercier, husband and wife

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**NEW HAMPSHIRE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**     Form 3030 1/01

VMP-6A(NH) (1302).00
Page 1 of 15     Initials:
VMP Mortgage Solutions, Inc.

**(D) "Lender"** is Quicken Loans Inc.

Lender is a Corporation
organized and existing under the laws of                 the State of Michigan
Lender's address is 1050 Woodward Ave. Detroit. MI  48226-1906

**(E) "Note"** means the promissory note signed by Borrower and dated        May 3, 2014
The Note states that Borrower owes Lender Seventy Six Thousand Two Hundred
Seventy Five and 00/100                                                      **Dollars**
(U.S. $ 76,275.00                ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than       June 1, 2044         .
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| XX Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | XX Other(s) [specify] |
| | | Legal Attached |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS with mortgage covenants, and with power of sale, the following described property located in the      County      of      Merrimack      :
       [Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

Parcel ID Number:      ▮▮▮▮▮      which currently has the address of
81 E Bow St                                                   [Street]
           Franklin          [City], New Hampshire 03235      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

NEW HAMPSHIRE-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**
VMP-6A(NH) (1302).00              Page 3 of 15      Initials:            Form 3030 1/01

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

NEW HAMPSHIRE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
VMP-6A(NH) (1302).00 Page 7 of 15 Initials: Form 3030 1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail copies of a notice of sale in the manner provided by Applicable Law to Borrower and other persons prescribed by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender shall deliver to the purchaser Lender's deed conveying indefeasible title to the Property, discharged of all rights of redemption by Borrower. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Discharge.** The Lender, within 60 days after this Security Instrument is satisfied and having reasonable charges tendered to the Lender, shall cause the discharge of this Security Instrument to be recorded in the registry of deeds where the Property lies. The recording fees associated with the discharge of this Security Instrument may be charged to the Borrower, if the Borrower received written disclosure that such fees would be so charged. The Lender shall provide written confirmation of the discharge within the 60-day period to the payor of the final payment in satisfaction of this Security Instrument.

**24. Releases.** Borrower, and Borrower's spouse, if any, release all rights of homestead in the Property and release all rights of curtesy and other interests in the Property.

**25. Attorneys' Fees.** Pursuant to New Hampshire Revised Statutes Annotated Section 361-C:2, in the event that Borrower shall prevail in (a) any action suit or proceeding, brought by Lender, or (b) an action brought by Borrower, reasonable attorneys' fees shall be awarded to Borrower. Further, if Borrower shall successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by Lender, a court may withhold from Lender the entire amount or such portion of its attorneys' fees as the court shall consider equitable.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _Paul J. Mercier_ 05/03/2014 ___ (Seal)
                                   Paul J. Mercier                -Borrower

_____          _Monique R. Mercier_ 05/03/2014 ___ (Seal)
                                   Monique R. Mercier              -Borrower

_____(Seal)    _____(Seal)
               -Borrower                          -Borrower

_____(Seal)    _____(Seal)
               -Borrower                          -Borrower

_____(Seal)    _____(Seal)
               -Borrower                          -Borrower

**STATE OF NEW HAMPSHIRE**
(County) of Merrimack

This instrument was acknowledged before me on        May 3, 2014        by
Paul J. Mercier and Monique R. Mercier, husband and wife



_Debi Jeanne Langlais_
Debi Jeanne Langlais (Signature of Notarial Officer)
New Hampshire Notary Public
                                    Title (and rank)

My Commission Expires:     7/15/2014

Loan origination organization Quicken Loans Inc.
NMLS ID ████
Loan originator Anthony Hugan
NMLS ID ████

NEW HAMPSHIRE-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**
VMP-6A(NH) (1302).00          Page 15 of 15      Initials:          Form 3030 1/01

## EXHIBIT A - LEGAL DESCRIPTION

Tax Id Number(s):

Land Situated in the City of Franklin in the County of Merrimack in the State of NH

A CERTAIN TRACT OF LAND WITH THE BUILDINGS THEREON SITUATED IN SAID FRANKLIN, COUNTY OF
MERRIMACK, STATE OF NEW HAMPSHIRE, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A CEMENT MARKER ON THE NORTHERLY SIDE OF EAST BOW STREET AT THE
SOUTHEAST CORNER OF LAND OF JOSEPH HENRY ROY AND MARY A. ROY, FORMERLY OF MERILDA M.
ROUSSEAU; THENCE RUNNING EASTERLY ON SAID EAST BOW STREET TO LAND OF ALCIDE AND MARIE
Z., A DISTANCE OF SIXTY-EIGHT (68) FEET; THENCE NORTHERLY ALONG SAID LABRANCHE LAND
EIGHTY-TWO (82) FEET TO OTHER LAND OF SAID ROYS, FORMERLY OF ROUSSEAU; THENCE WESTERLY
ALONG SAID ROY LAND SIXTY-EIGHT (68) FEET TO A CORNER; THENCE SOUTHERLY ALONG SAID ROY
LAND TO THE POINT OF BEGINNING.

NOTE: The Company is prohibited from insuring the area or quantity of the land. The Company does
not represent that any acreage or footage calculations are correct. References to quantity are for
identification purposes only.

Commonly known as:    81 East Bow Street , Franklin, NH 03235

MERS MIN:

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*)- Rate Caps)

**THIS FIXED/ADJUSTABLE RATE RIDER** is made this   3rd   day of    May, 2014
                 , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given
by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the
"Note") to    Quicken Loans Inc.

("Lender") of the same date and covering the property described in the Security Instrument
and located at:                        81 E Bow St
                              Franklin, NH 03235
                              [Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of          3.990 %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of  June            2021    , and the adjustable interest rate I will pay may change
on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate
could change, is called a "Change Date."

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER- WSJ One-Year LIBOR-** Single Family -
**Fannie Mae Uniform Instrument**

                    **Form 3187 6/01**
Wolters Kluwer Financial Services
VMP ®-168R (0807)
Page 1 of 4         Initials:

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter                                                                                   percentage points
(                          2.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than
                           8.990 % or less than                          2.250    %. Thereafter, my adjustable
interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                          8.990          %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER- WSJ One-Year LIBOR-** Single Family -
**Fannie Mae Uniform Instrument**
VMP ®-168R (0807)                                    Page 2 of 4                    Initials: _____  **Form 3187 6/01**

bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER- WSJ One-Year LIBOR-** Single Family -
**Fannie Mae Uniform Instrument**
VMP ®-168R (0807)                    Page 3 of 4            Initials: _____ **Form 3187 6/01**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ 05/03/2014 (Seal)    _____ 05/03/2014 (Seal)
Paul J. Mercier            -Borrower    Monique R. Mercier        -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER- WSJ One-Year LIBOR-** Single Family -
**Fannie Mae Uniform Instrument**                        **Form 3187 6/01**
VMP ®-168R (0807)              Page 4 of 4

MERS MIN: ▮▮▮▮▮▮▮                                                    Mercier, Paul

# FIXED/ADJUSTABLE RATE NOTE

**(LIBOR One-Year Index (As Published In *The Wall Street Journal*)-Rate Caps)**

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

May 3, 2014                          Franklin                       NH
[Date]                                [City]                      [State]
                                   81 E Bow St
                              Franklin, NH 03235
                               [Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $76,275.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is  Quicken Loans Inc.

.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        3.990%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on      July 1, 2014          .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on       June 1, 2044           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 6577, Carol Stream, IL  60197

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $363.71          . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of June        2021     , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

**MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument -
New Hampshire**

Wolters Kluwer Financial Services ▮▮▮▮
VMP ®-168N(NH) (1302).00            Form 3528 6/04
Page 1 of 5                        Initials: _____



The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter percentage points ( 2.250%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.990% or less than 2.250%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 8.990 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. ATTORNEYS' FEES

Pursuant to New Hampshire Revised Statutes Annotated Section 361-C:2, in the event that Borrower shall prevail in (a) any action, suit or proceeding, brought by Lender, or (b) an action brought by Borrower, reasonable attorneys' fees shall be awarded to Borrower. Further, if Borrower shall successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by Lender, a court may withhold from Lender the entire amount or such portion of its attorneys' fees as the court shall consider equitable.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR- Single Family - Fannie Mae Uniform Instrument-
New Hampshire
Form 3528 6/01
VMP ®-168N(NH) (1302).00
Page 4 of 5
Initials:

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Paul J. Mercier_  05/03/2014 (Seal)  _____ (Seal)
Paul J. Mercier                  -Borrower                          -Borrower

_____ (Seal)  _____ (Seal)
                -Borrower                          -Borrower

_____ (Seal)  _____ (Seal)
                -Borrower                          -Borrower

_____ (Seal)  _____ (Seal)
                -Borrower                          -Borrower

[Sign Original Only]

Loan origination organization  Quicken Loans Inc.
NMLS ID  █████
Loan originator  Anthony Hugan
NMLS ID  █████

██████████████

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR- Single Family - Fannie Mae Uniform Instrument -
New Hampshire
VMP ®-168N(NH) (1302).00                 Page 5 of 5                 Form 3528 6/01

**Recording Requested By/Return To:**

Final Docs Team

1050 Woodward Ave.

Detroit, MI 48226

**This Instrument Prepared By:**

Cody Levins

Quicken Loans Inc.

1050 Woodward Ave.

Detroit, MI 48226

**Tel. No.:** (313) 373-0015

# Assignment of Mortgage

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for QUICKEN LOANS INC. whose address is P.O. Box 2026, Flint, MI 48501-2026

its successors and assigns, does hereby grant,

assign, transfer and convey, unto  Quicken Loans Inc.

, a corporation

organized and existing under the laws of   The State of Michigan         (herein "Assignee"), whose

address is 1050 Woodward Ave. Detroit, MI 48226

, its successors

and assigns, all its right, title and interest in and to a certain Mortgage dated     May 3, 2014       ,

made and executed by

PAUL J. MERCIER AND MONIQUE R. MERCIER, HUSBAND AND WIFE

whose address is  81 E Bow St Franklin NH, 03235

to and in favor of Mortgage Electronic Registration Systems, Inc ("MERS") as a nominee for QUICKEN LOANS INC. its successors and assigns                                                           upon the

following described property situated in   MERRIMACK                                    County, State

of New Hampshire                        :

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A

PART  HEREOF SUBJECT TO COVENANTS OF RECORD.

Tax Parcel #: 117-311-00

| Mortgage Recorded On: 05/08/2014 | Book/Liber#: 3438 |
|---|---|
| Document Number: 201400006866 | Page#: 2457 |
| MIN: | MERS Phone: 1-888-679-6377 |

MERS Assignment of Mortgage

VMP ®

Wolters Kluwer Financial Services  © 2000, 2011

VMP95M (1104).00

Page 1 of 3

such Mortgage having been given to secure payment of
Seventy Six Thousand Two Hundred Seventy Five Dollars and 00/100

($ 76,275.00 ) (Include the Original Principal Amount) which Mortgage is of record
in Book, Volume, or Liber No. 3438 , at page 2457 (or as No.
201400006866 ) of the Records of
MERRIMACK County, State of
New Hampshire and all rights accrued or to accrue under such Mortgage.

    TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the above-described Mortgage.

    IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on April 24, 2018

_____

Witness Donnella Smith

**Mortgage Electronic Registration Systems, Inc.**
**("MERS") as nominee for**
QUICKEN LOANS INC. , its successors and assigns

_____

Witness Thomas Boston

By: _____
                           (Signature)

Name: Joanna Emler

Title: Assistant Secretary of MERS

Attest

**Acknowledgement**

State of Michigan

County of Wayne

On 04/24/2018    , before me Kelly Osborne        , a Notary Public of Michigan , personally appeared
Joanna Emler        , Assistant Secretary of Mortgage Electronic Registration Systems, Inc.,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s)
on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument.

WITNESS my hand and official seal.

KELLY OSBORNE
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires May 3, 2023
Acting in the County of ___WAYNE

Name: Kelly Osborne

Title: Notary Public

MERS Assignment of Mortgage
Wolters Kluwer Financial Services © 2000, 2011

VMP95M (1104).00
Page 3 of 3

## EXHIBIT A - LEGAL DESCRIPTION

Tax Id Number( 

Land Situated  in the City of Franklin in the County of Merrimack in the State of NH

A CERTAIN TRACT OF LAND WITH THE BUILDINGS THEREON SITUATED IN SAID FRANKLIN, COUNTY OF MERRIMACK, STATE OF NEW HAMPSHIRE, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A CEMENT MARKER ON THE NORTHERLY SIDE OF EAST BOW STREET AT THE SOUTHEAST CORNER OF LAND OF JOSEPH HENRY ROY AND MARY A. ROY, FORMERLY OF MERILDA M. ROUSSEAU; THENCE RUNNING EASTERLY ON SAID EAST BOW STREET TO LAND OF ALCIDE AND MARIE Z., A DISTANCE OF SIXTY-EIGHT (68) FEET; THENCE NORTHERLY ALONG SAID LABRANCHE LAND EIGHTY-TWO (82) FEET TO OTHER LAND OF SAID ROYS, FORMERLY OF ROUSSEAU; THENCE WESTERLY ALONG SAID ROY LAND SIXTY-EIGHT (68) FEET TO A CORNER; THENCE SOUTHERLY ALONG SAID ROY LAND TO THE POINT OF BEGINNING.

NOTE: The Company is prohibited from insuring the area or quantity of the land. The Company does not represent that any acreage or footage calculations are correct. References to quantity are for identification purposes only.

Commonly known as:   81 East Bow Street , Franklin, NH 03235